## UNITED STATES *v.* BREWSTER

No. 70–45. Argued October 18, 1971—Reargued March 20, 1972—
Decided June 29, 1972

BURGER, C. J., delivered the opinion of the Court, in which STEW-
ART, MARSHALL, BLACKMUN, POWELL, and REHNQUIST, JJ., joined.
BRENNAN, J., filed a dissenting opinion in which DOUGLAS, J., joined,
*post*, p. 529. WHITE, J., filed a dissenting opinion, in which DOUGLAS
and BRENNAN, JJ., joined, *post*, p. 551.

*Solicitor General Griswold* reargued the cause for the United States. With him on the briefs on the original argument were *Assistant Attorney General Wilson, Jerome M. Feit,* and *Beatrice Rosenberg.* With him on the brief on the reargument were *Assistant Attorney General Petersen* and *Mr. Feit.*

*Norman P. Ramsey* reargued the cause for appellee. With him on the briefs were *Thomas Waxter, Jr.,* and *H. Thomas Howell.*

MR. CHIEF JUSTICE BURGER delivered the opinion of the Court.

This direct appeal from the District Court presents the question whether a Member of Congress may be prosecuted under 18 U. S. C. §§ 201 (c)(1), 201 (g), for accepting a bribe in exchange for a promise relating to an official act. Appellee, a former United States Senator, was charged in five counts of a 10-count indictment.[1] Counts one, three, five, and seven alleged that on four separate occasions, appellee, while he was a Senator and a member of the Senate Committee on Post Office and Civil Service,

> "directly and indirectly, corruptly asked, solicited, sought, accepted, received and agreed to receive [sums] . . . in return for being influenced in his performance of official acts in respect to his action, vote, and decision on postage rate legislation which might at any time be pending before him in his official capacity . . . in violation of Sections 201 (c)(1) and 2, Title 18, United States Code."[2]

---

[1] The remaining five counts charged the alleged bribers with offering and giving bribes in violation of 18 U. S. C. § 201 (b).

[2] Title 18 U. S. C. § 201 (c) provides: "Whoever, being a public official or person selected to be a public official, directly or indirectly, corruptly asks, demands, exacts, solicits, seeks, accepts, receives,

Count nine charged that appellee

> "directly and indirectly, asked, demanded, exacted, solicited, sought, accepted, received and agreed to receive [a sum] . . . for and because of official acts performed by him in respect to his action, vote and decision on postage rate legislation which had been pending before him in his official capacity . . . in violation of Sections 201 (g) and 2, Title 18, United States Code." [3]

Before a trial date was set, the appellee moved to dismiss the indictment on the ground of immunity under the Speech or Debate Clause, Art. I, § 6, of the Constitution, which provides:

> "[F]or any Speech or Debate in either House, they [Senators or Representatives] shall not be questioned in any other Place."

After hearing argument, the District Court ruled from the bench:

> "Gentlemen, based on the facts of this case,

---

or agrees to receive anything of value for himself or for any other person or entity, in return for:

"(1) being influenced in his performance of any official act . . . [shall be guilty of an offense]."

Title 18 U. S. C. § 201 (a) defines "public official" to include "Member of Congress." The same subsection provides: " 'official act' means any decision or action on any question, matter, cause, suit, proceeding or controversy, which may at any time be pending, or which may by law be brought before any public official, in his official capacity, or in his place of trust or profit." Title 18 U. S. C. § 2 is the aiding or abetting statute.

[3] Title 18 U. S. C. § 201 (g) provides: "Whoever, being a public official, former public official, or person selected to be a public official, otherwise than as provided by law for the proper discharge of official duty, directly or indirectly asks, demands, exacts, solicits, seeks, accepts, receives, or agrees to receive anything of value for himself for or because of any official act performed or to be performed by him . . . [shall be guilty of an offense]."

it is admitted by the Government that the five counts of the indictment which charge Senator Brewster relate to the acceptance of bribes in connection with the performance of a legislative function by a Senator of the United States.

"It is the opinion of this Court that the immunity under the Speech and [sic] Debate Clause of the Constitution, particularly in view of the interpretation given that Clause by the Supreme Court in Johnson, shields Senator Brewster, constitutionally shields him from any prosecution for alleged bribery to perform a legislative act.

"I will, therefore, dismiss the odd counts of the indictment, 1, 3, 5, 7 and 9, as they apply to Senator Brewster."

The United States filed a direct appeal to this Court, pursuant to 18 U. S. C. § 3731 (1964 ed., Supp. V).[4] We postponed consideration of jurisdiction until hearing the case on the merits. 401 U. S. 935 (1971).

## I

The United States asserts that this Court has jurisdiction under 18 U. S. C. § 3731 (1964 ed., Supp. V) to

---

[4] Title 18 U. S. C. § 3731 provided in relevant part:

"An appeal may be taken by and on behalf of the United States from the district courts direct to the Supreme Court of the United States in all criminal cases in the following instances:

"From a decision or judgment setting aside, or dismissing any indictment or information, or any count thereof, where such decision or judgment is based upon the invalidity or construction of the statute upon which the indictment or information is founded.

. . . . .

"From the decision or judgment sustaining a motion in bar, when the defendant has not been put in jeopardy."

The statute has since been amended to eliminate the direct appeal provision on which the United States relies. 18 U. S. C. § 3731. This appeal, however, was perfected under the old statute.

review the District Court's dismissal of the indictment against appellee. Specifically, the United States urges that the District Court decision was either "a decision or judgment setting aside, or dismissing [an] indictment . . . or any count thereof, where such decision or judgment is based upon the invalidity or construction of the statute upon which the indictment . . . is founded" or a "decision or judgment sustaining a motion in bar, when the defendant has not been put in jeopardy." If the District Court decision is correctly characterized by either of those descriptions, this Court has jurisdiction under the statute to hear the United States' appeal.

In *United States* v. *Knox,* 396 U. S. 77 (1969), we considered a direct appeal by the United States from the dismissal of an indictment that charged the appellee in that case with violating 18 U. S. C. § 1001, a general criminal provision punishing fraudulent statements made to any federal agency. The appellee, Knox, had been accused of willfully understating the number of employees accepting wagers on his behalf when he filed a form that persons engaged in the business of accepting wagers were required by law to file. The District Court dismissed the counts charging violations of § 1001 on the ground that the appellee could not be prosecuted for failure to answer the wagering form correctly since his Fifth Amendment privilege against self-incrimination prevented prosecution for failure to file the form in any respect. We found jurisdiction under § 3731 to hear the appeal in *Knox* on the theory that the District Court had passed on the validity of the statute on which the indictment rested. 396 U. S., at 79 n. 2. The District Court in that case held that "§ 1001, as applied to this class of cases, is constitutionally invalid." *Ibid.*

The counts of the indictment involved in the instant case were based on 18 U. S. C. § 201, a bribery statute.

Section 201 applies to "public officials," and that term is defined explicitly to include Members of Congress as well as other employees and officers of the United States. Subsections (c)(1) and (g) prohibit the accepting of a bribe in return for being influenced in or performing an official act. The ruling of the District Court here was that "the Speech [or] Debate Clause of the Constitution, particularly in view of the interpretation given . . . in Johnson, shields Senator Brewster . . . from any prosecution for alleged bribery to perform a legislative act." Since § 201 applies only to bribery for the performance of official acts, the District Court's ruling is that, as applied to Members of Congress, § 201 is constitutionally invalid.

Appellee argues that the action of the District Court was not "a decision or judgment setting aside, or dismissing" the indictment, but was instead a summary judgment on the merits. Appellee also argues that the District Court did not rule that § 201 could never be constitutionally applied to a Member of Congress, but that "based on the facts of this case" the statute could not be constitutionally applied. Under *United States* v. *Sisson,* 399 U. S. 267 (1970), an appeal does not lie from a decision that rests, not upon the sufficiency of the indictment alone, but upon extraneous facts. If an indictment is dismissed as a result of a stipulated fact or the showing of evidentiary facts outside the indictment, which facts would constitute a defense on the merits at trial, no appeal is available. See *United States* v. *Findley,* 439 F. 2d 970 (CA1 1971). Appellee claims that the District Court relied on factual matter other than facts alleged in the indictment.

An examination of the record, however, discloses that, with the exception of a letter in which the United States briefly outlined the theory of its case against appellee, there were no "facts" on which the District Court could

act other than those recited in the indictment. Appellee contends that the statement "based on the facts of this case," used by the District Judge in announcing his decision, shows reliance on the Government's outline of its case. We read the District Judge's reference to "facts," in context, as a reference to the facts alleged in the indictment, and his ruling as holding that Members of Congress are totally immune from prosecution for accepting bribes for the performance of official, i. e., legislative, acts by virtue of the Speech or Debate Clause. Under that interpretation of § 201, it cannot be applied to a Member of Congress who accepts bribes that relate in any way to his office. We conclude, therefore, that the District Court was relying only on facts alleged in the indictment and that the dismissal of the indictment was based on a determination that the statute on which the indictment was drawn was invalid under the Speech or Debate Clause. As a consequence, this Court has jurisdiction to hear the appeal.

## II

The immunities of the Speech or Debate Clause were not written into the Constitution simply for the personal or private benefit of Members of Congress, but to protect the integrity of the legislative process by insuring the independence of individual legislators. The genesis of the Clause at common law is well known. In his opinion for the Court in *United States* v. *Johnson,* 383 U. S. 169 (1966), Mr. Justice Harlan canvassed the history of the Clause and concluded that it

"was the culmination of a long struggle for parliamentary supremacy. Behind these simple phrases lies a history of conflict between the Commons and the Tudor and Stuart monarchs during which successive monarchs utilized the criminal and civil law to suppress and intimidate critical legisla-

tors. Since the Glorious Revolution in Britain, and throughout United States history, the privilege has been recognized as an important protection of the independence and integrity of the legislature." *Id.,* at 178 (footnote omitted).

Although the Speech or Debate Clause's historic roots are in English history, it must be interpreted in light of the American experience, and in the context of the American constitutional scheme of government rather than the English parliamentary system. We should bear in mind that the English system differs from ours in that their Parliament is the supreme authority, not a co-ordinate branch. Our speech or debate privilege was designed to preserve legislative independence, not supremacy.[5] Our task, therefore, is to apply the Clause in such a way as to insure the independence of the legislature without altering the historic balance of the three co-equal branches of Government.

It does not undermine the validity of the Framers' concern for the independence of the Legislative Branch to acknowledge that our history does not reflect a catalogue of abuses at the hands of the Executive that gave rise to the privilege in England. There is nothing in our history, for example, comparable to the imprisonment of a Member of Parliament in the Tower without a hearing and, owing to the subservience of some royal judges to the 17th and 18th century English kings, without meaningful recourse to a writ of habeas corpus.[6] In fact, on only one previous occasion has this Court ever

[5] Cella, The Doctrine of Legislative Privilege of Freedom of Speech and Debate: Its Past, Present and Future as a Bar to Criminal Prosecutions in the Courts, 2 Suffolk L. Rev. 1, 15 (1968); Note, The Bribed Congressman's Immunity from Prosecution, 75 Yale L. J. 335, 337–338 (1965).

[6] See C. Wittke, The History of English Parliamentary Privilege 23–32 (1921).

interpreted the Speech or Debate Clause in the context of a criminal charge against a Member of Congress.

(a) In *United States* v. *Johnson, supra,* the Court reviewed the conviction of a former Representative on seven counts of violating the federal conflict-of-interest statute, 18 U. S. C. § 281 (1964 ed.), and on one count of conspiracy to defraud the United States, 18 U. S. C. § 371. The Court of Appeals had set aside the conviction on the count for conspiracy to defraud as violating the Speech or Debate Clause. Mr. Justice Harlan, speaking for the Court, 383 U. S., at 183, cited the oft-quoted passage of Mr. Justice Lush in *Ex parte Wason,* L. R. 4 Q. B. 573 (1869):

> "I am clearly of opinion that we ought not to allow it to be doubted for a moment that the motives or intentions of members of either House cannot be inquired into by criminal proceedings *with respect to anything they may do or say in the House.*" *Id.,* at 577 (emphasis added).

In *Kilbourn* v. *Thompson,* 103 U. S. 168 (1881), the first case in which this Court interpreted the Speech or Debate Clause, the Court expressed a similar view of the ambit of the American privilege. There the Court said the Clause is to be read broadly to include anything "generally done in a session of the House by one of its members in relation to the business before it." *Id.,* at 204. This statement, too, was cited with approval in *Johnson,* 383 U. S., at 179. Our conclusion in *Johnson* was that the privilege protected Members from inquiry into legislative acts or the motivation for actual performance of legislative acts. *Id.,* at 185.

In applying the Speech or Debate Clause, the Court focused on the specific facts of the *Johnson* prosecution. The conspiracy-to-defraud count alleged an agreement among Representative Johnson and three co-

defendants to obtain the dismissal of pending indictments against officials of savings and loan institutions. For these services, which included a speech made by Johnson on the House floor, the Government claimed Johnson was paid a bribe. At trial, the Government questioned Johnson extensively, relative to the conspiracy-to-defraud count, concerning the authorship of the speech, the factual basis for certain statements made in the speech, and his motives for giving the speech. The Court held that the use of evidence of a speech to support a count under a broad conspiracy statute was prohibited by the Speech or Debate Clause. The Government was, therefore, precluded from prosecuting the conspiracy count on retrial, insofar as it depended on inquiries into speeches made in the House.

It is important to note the very narrow scope of the Court's holding in *Johnson:*

> "We hold that a prosecution under a general criminal statute dependent on such inquiries [into the speech or its preparation] necessarily contravenes the Speech or Debate Clause. We emphasize that our holding is limited to prosecutions involving circumstances such as those presented in the case before us." 383 U. S., at 184–185.

The opinion specifically left open the question of a prosecution which, though possibly entailing some reference to legislative acts, is founded upon a "narrowly drawn" statute passed by Congress in the exercise of its power to regulate its Members' conduct. Of more relevance to this case, the Court in *Johnson* emphasized that its decision did not affect a prosecution that, though founded on a criminal statute of general application, "does not draw in question the legislative acts of the defendant member of Congress or his motives for performing them." *Id.,* at 185. The Court did not

question the power of the United States to try Johnson on the conflict-of-interest counts, and it authorized a new trial on the conspiracy count, provided that all references to the making of the speech were eliminated.[7]

Three members of the Court would have affirmed Johnson's conviction. Mr. Chief Justice Warren, joined by MR. JUSTICE DOUGLAS and MR. JUSTICE BRENNAN, concurring in part and dissenting in part, stated:

> "After reading the record, it is my conclusion that the Court of Appeals erred in determining that the evidence concerning the speech infected the jury's judgment on the [conflict-of-interest] counts. The evidence amply supports the prosecution's theory and the jury's verdict on these counts—that the respondent received over $20,000 for attempting to have the Justice Department dismiss an indictment against his [present] co-conspirators, without disclosing his role in the enterprise. This is the classic example of a violation of § 281 by a Member of the Congress. . . . The arguments of government counsel and the court's instructions separating the conspiracy from the substantive counts seem unimpeachable. The speech was a minor part of the prosecution. There was nothing in it to inflame the jury and the respondent pointed with pride to it as evidence of his vigilance in protecting the financial institutions of his State. The record further reveals that the trial participants were well aware that a finding of criminality on one count did not authorize sim-

---

[7] On remand, the District Court dismissed the conspiracy count without objection from the Government. Johnson was then found guilty on the remaining counts, and his conviction was affirmed. *United States* v. *Johnson,* 419 F. 2d 56 (CA4 1969), cert. denied, 397 U. S. 1010 (1970).

ilar conclusions as to other counts, and I believe that this salutary principle was conscientiously followed. Therefore, I would affirm the convictions on the substantive counts." *Id.,* at 188–189. (Footnote omitted.)

*Johnson* thus stands as a unanimous holding that a Member of Congress may be prosecuted under a criminal statute provided that the Government's case does not rely on legislative acts or the motivation for legislative acts. A legislative act has consistently been defined as an act generally done in Congress in relation to the business before it. In sum, the Speech or Debate Clause prohibits inquiry only into those things generally said or done in the House or the Senate in the performance of official duties and into the motivation for those acts.

It is well known, of course, that Members of the Congress engage in many activities other than the purely legislative activities protected by the Speech or Debate Clause. These include a wide range of legitimate "errands" performed for constituents, the making of appointments with Government agencies, assistance in securing Government contracts, preparing so-called "news letters" to constituents, news releases, and speeches delivered outside the Congress. The range of these related activities has grown over the years. They are performed in part because they have come to be expected by constituents, and because they are a means of developing continuing support for future elections. Although these are entirely legitimate activities, they are political in nature rather than legislative, in the sense that term has been used by the Court in prior cases. But it has never been seriously contended that these political matters, however appropriate, have the protection afforded by the Speech or Debate Clause. Careful examination of the decided cases reveals that the Court has regarded the protection as reaching only those things "generally done in a

session of the House by one of its members in relation to the business before it," *Kilbourn* v. *Thompson, supra,* at 204, or things "said or done by him, as a representative, in the exercise of the functions of that office," *Coffin* v. *Coffin,* 4 Mass. 1, 27 (1808).

(b) Appellee argues, however, that in *Johnson* we expressed a broader test for the coverage of the Speech or Debate Clause. It is urged that we held that the Clause protected from executive or judicial inquiry all conduct "related to the due functioning of the legislative process." It is true that the quoted words appear in the *Johnson* opinion, but appellee takes them out of context; in context they reflect a quite different meaning from that now urged. Although the indictment against Johnson contained eight counts, only one count was challenged before this Court as in violation of the Speech or Debate Clause. The other seven counts concerned Johnson's attempts to influence staff members of the Justice Department to dismiss pending prosecutions. In explaining why those counts were not before the Court, Mr. Justice Harlan wrote:

> "No argument is made, nor do we think that it could be successfully contended, that the Speech or Debate Clause reaches conduct, such as was involved in the attempt to influence the Department of Justice, that is in no wise *related to the due functioning of the legislative process.* It is the application of this broad conspiracy statute to an improperly motivated speech that raises the constitutional problem with which we deal." 383 U. S., at 172. (Emphasis added; footnote omitted.)

In stating that those things "in no wise related to the due functioning of the legislative process" were *not* covered by the privilege, the Court did not in any sense imply as a corollary that everything that "related" to the

office of a Member was shielded by the Clause. Quite the contrary, in *Johnson* we held, citing *Kilbourn* v. *Thompson, supra,* that only acts generally done in the course of the process of enacting legislation were protected.

Nor can we give *Kilbourn* a more expansive interpretation. In citing with approval, 103 U. S., at 203, the language of Chief Justice Parsons of the Supreme Judicial Court of Massachusetts in *Coffin* v. *Coffin,* 4 Mass. 1 (1808), the *Kilbourn* Court gave no thought to enlarging "legislative acts" to include illicit conduct outside the House. The *Coffin* language is:

> "[The Massachusetts legislative privilege] ought not to be construed strictly, but liberally, that the full design of it may be answered. I will not confine it to delivering an opinion, uttering a speech, or haranguing in debate; but will extend it to the giving of a vote, to the making of a written report, and to every other act resulting from the nature, and in the execution, of the office: and I would define the article, as securing to every member exemption from prosecution, *for every thing said or done by him, as a representative, in the exercise of the functions of that office* without enquiring whether the exercise was regular according to the rules of the house, or irregular and against their rules. I do not confine the member to his place in the house; and I am satisfied that there are cases, in which he is entitled to this privilege, when not within the walls of the representatives' chamber." *Id.,* at 27 (emphasis added).

It is suggested that in citing these words, which were also quoted with approval in *Tenney* v. *Brandhove,* 341 U. S. 367, 373–374 (1951), the Court was interpreting the sweep of the Speech or Debate Clause to be broader than *Johnson* seemed to indicate or than we today hold. Emphasis is placed on the statement that "there are

cases in which [a Member] is entitled to this privilege, when not within the walls of the representatives' chamber." But the context of *Coffin* v. *Coffin* indicates that in this passage Chief Justice Parsons was referring only to legislative acts, such as committee meetings, which take place outside the physical confines of the legislative chamber. In another passage, the meaning is clarified:

> "If a member . . . be out of the chamber, sitting in committee, executing the commission of the house, it appears to me that such member is within the reason of the article, and ought to be considered within the privilege. The body of which he is a member, is in session, and he, as a member of that body, is in fact discharging the duties of his office. He ought therefore to be protected from civil or criminal prosecutions for every thing said or done by him in the exercise of his functions, as a representative in committee, either in debating, in assenting to, or in draughting a report." [8] 4 Mass., at 28.

In no case has this Court ever treated the Clause as protecting all conduct *relating* to the legislative process.[9] In every case thus far before this Court, the Speech or Debate Clause has been limited to an act which was

---

[8] It is especially important to note that in *Coffin* v. *Coffin*, the court concluded that the defendant was not executing the duties of his office when he allegedly defamed the plaintiff and was hence not entitled to the claim of privilege.

[9] The "concession" MR. JUSTICE BRENNAN seeks to attribute to the Government lawyer who argued the case in the District Court reveals no more than the failure of the arguments in that court to focus on the distinction between true legislative acts and the myriad related political functions of a Member of Congress. The "concession" came in response to a question clearly revealing that the District Court treated as protected all acts "related" to the office rather than limiting the protection to what is "said or done by him, as a representative, in the exercise of the functions of that office."

clearly a part of the legislative process—the *due* functioning of the process.[10] Appellee's contention for a broader interpretation of the privilege draws essentially on the flavor of the rhetoric and the sweep of the language used by courts, not on the precise words used in any prior case, and surely not on the sense of those cases, fairly read.

(c) We would not think it sound or wise, simply out of an abundance of caution to doubly insure legislative independence, to extend the privilege beyond its intended scope, its literal language, and its history, to include all things in any way related to the legislative process. Given such a sweeping reading, we have no doubt that there are few activities in which a legislator engages that he would be unable somehow to "relate" to the legislative process. Admittedly, the Speech or Debate Clause must be read broadly to effectuate its purpose of protecting the independence of the Legislative Branch, but no more than the statutes we apply, was its purpose to make Members of Congress super-citizens, immune from criminal responsibility. In its narrowest scope, the Clause is a very large, albeit essential, grant of privilege. It has enabled reckless men to slander and even destroy others with impunity, but that was the conscious choice of the Framers.[11]

---

[10] See *Kilbourn* v. *Thompson,* 103 U. S. 168 (1881) (voting for a resolution); *Tenney* v. *Brandhove,* 341 U. S. 367 (1951) (harassment of witness by state legislator during a legislative hearing; not a Speech or Debate Clause case); *United States* v. *Johnson,* 383 U. S. 169 (1966) (making a speech on House floor); *Dombrowski* v. *Eastland,* 387 U. S. 82 (1967) (subpoenaing records for committee hearing); *Powell* v. *McCormack,* 395 U. S. 486 (1969) (voting for a resolution).

In *Coffin* v. *Coffin,* 4 Mass. 1 (1808), the state equivalent of the Speech or Debate Clause was held to be inapplicable to a legislator who was acting outside of his official duties.

[11] "To this construction of the article it is objected, that a private citizen may have his character basely defamed, without any pecuniary

The history of the privilege is by no means free from grave abuses by legislators. In one instance, abuses reached such a level in England that Parliament was compelled to enact curative legislation.

> "The practice of granting the privilege of freedom from arrest and molestation to members' servants in time became a serious menace to individual liberty and to public order, and a form of protection by which offenders often tried—and they were often successful—to escape the penalties which their offences deserved and which the ordinary courts would not have hesitated to inflict. Indeed, the sale of 'protections' at one time proved a source of income to unscrupulous members, and these parliamentary 'indulgences' were on several occasions obtainable at a fixed market price." C. Wittke, The History of English Parliamentary Privilege 39 (1921).

The authors of our Constitution were well aware of the history of both the need for the privilege and the abuses that could flow from too sweeping safeguards. In order to preserve other values, they wrote the privilege so that it tolerates and protects behavior on the part of Members not tolerated and protected when done by other citizens, but the shield does not extend beyond what is necessary to preserve the integrity of the legislative process. Moreover, unlike England with no formal, written constitutional limitations on the monarch, we defined limits on the co-ordinate branches, pro-

---

recompense or satisfaction. The truth of the objection is admitted. . . . The injury to the reputation of a private citizen is of less importance to the commonwealth, than the free and unreserved exercise of the duties of a representative, unawed by the fear of legal prosecutions." *Coffin* v. *Coffin,* 4 Mass., at 28.

See *Cochran* v. *Couzens,* 59 App. D. C. 374, 42 F. 2d 783, cert. denied, 282 U. S. 874 (1930) (defamatory words uttered on Senate floor could not be basis of slander action).

viding other checks to protect against abuses of the kind experienced in that country.

It is also suggested that, even if we interpreted the Clause broadly so as to exempt from inquiry all matters having any relationship to the legislative process, misconduct of Members would not necessarily go unpunished because each House is empowered to discipline its Members. Article I, § 5, does indeed empower each House to "determine the Rules of its Proceedings, punish its Members for disorderly Behavior, and, with the Concurrence of two thirds, expel a Member," but Congress is ill-equipped to investigate, try, and punish its Members for a wide range of behavior that is loosely and incidentally related to the legislative process. In this sense, the English analogy on which the dissents place much emphasis, and the reliance on *Ex parte Wason,* L. R. 4 Q. B. 573 (1869), are inapt. Parliament is itself "The High Court of Parliament"—the highest court in the land—and its judicial tradition better equips it for judicial tasks.

> "It is by no means an exaggeration to say that [the judicial characteristics of Parliament] colored and influenced some of the great struggles over [legislative] privilege in and out of Parliament to the very close of the nineteenth century. It is not altogether certain whether they have been entirely forgotten even now. Nowhere has the theory that Parliament is a court—the highest court of the realm, often acting in a judicial capacity and in a judicial manner—persisted longer than in the history of privilege of Parliament." Wittke, *supra,* at 14.

The very fact of the supremacy of Parliament as England's highest tribunal explains the long tradition precluding trial for official misconduct of a member in any other and lesser tribunal.

In Australia and Canada, "where provision for legisla-

tive free speech or debate exists but where the legislature may not claim a tradition as the highest court of the realm, courts have held that the privilege does not bar the criminal prosecution of legislators for bribery." Note, The Bribed Congressman's Immunity from Prosecution, 75 Yale L. J. 335, 338 (1965) (footnote omitted). Congress has shown little inclination to exert itself in this area.[12] Moreover, if Congress did lay aside its normal activities and take on itself the responsibility to police and prosecute the myriad activities of its Members related to but not directly a part of the legislative function, the independence of individual Members might actually be impaired.

The process of disciplining a Member in the Congress is not without countervailing risks of abuse since it is not surrounded with the panoply of protective shields that are present in a criminal case. An accused Member is judged by no specifically articulated standards[13] and is at the mercy of an almost unbridled discretion of the charging body that functions at once as accuser, prosecutor, judge, and jury from whose decision there is no established right of review. In short, a Member would be compelled to defend in what would be comparable to a criminal prosecution without the safeguards provided by the Constitution. Moreover, it would be somewhat naive to assume that the triers would be wholly objective and free from considerations

---

[12] See Thomas, Freedom of Debate: Protector of the People or Haven for the Criminal?, 3 The Harvard Rev. 74, 80–81 (No. 3, 1965); Note, The Bribed Congressman's Immunity from Prosecution, 75 Yale L. J. 335, 349 n. 84 (1965); Oppenheim, Congressional Free Speech, 8 Loyola L. Rev. 1, 27–28 (1955–1956).

[13] See, *e. g.*, *In re Chapman*, 166 U. S. 661, 669–670 (1897):

"The right to expel extends to all cases where the offence is such as in the judgment of the Senate is inconsistent with the trust and duty of a member."

of party and politics and the passions of the moment.[14] Strong arguments can be made that trials conducted in a Congress with an entrenched majority from one political party could result in far greater harassment than a conventional criminal trial with the wide range of procedural protections for the accused, including indictment by grand jury, trial by jury under strict standards of proof with fixed rules of evidence, and extensive appellate review.

Finally, the jurisdiction of Congress to punish its Members is not all-embracing. For instance, it is unclear to what extent Congress would have jurisdiction over a case such as this in which the alleged illegal activity occurred outside the chamber, while the appellee was a Member, but was undiscovered or not brought before a grand jury until after he left office.[15]

The sweeping claims of appellee would render Members of Congress virtually immune from a wide range of crimes simply because the acts in question were peripherally related to their holding office. Such claims are inconsistent with the reading this Court has given, not only to the Speech or Debate Clause, but also to the other legislative privileges embodied in Art. I, § 6. The very sentence in which the Speech or Debate Clause appears provides that Members "shall in all Cases, ex-

---

[14] See the account of the impeachment of President Andrew Johnson in J. Kennedy, Profiles in Courage 126–151 (1955). See also the account of the impeachment of Mr. Justice Samuel Chase in 3 A. Beveridge, The Life of John Marshall 169–220 (1919).

[15] ". . . English Parliaments have historically reserved to themselves and still retain the sole and exclusive right to punish their members for the acceptance of a bribe in the discharge of their office. No member of Parliament may be tried for such an offense in any court of the land." Cella, supra, n. 5, at 15–16. That this is obviously not the case in this country is implicit in the remand of Representative Johnson to be retried on bribery charges.

cept Treason, Felony and Breach of the Peace, be privileged from Arrest during their Attendance at the Session of their Respective Houses. . . ." In *Williamson* v. *United States,* 207 U. S. 425 (1908), this Court rejected a claim, made by a Member convicted of subornation of perjury in proceedings for the purchase of public lands, that he could not be arrested, convicted, or imprisoned for any crime that was not treason, felony, or breach of the peace in the modern sense, *i. e.,* disturbing the peace. Mr. Justice Edward Douglass White noted that when the Constitution was written the term "breach of the peace" did not mean, as it came to mean later, a misdemeanor such as disorderly conduct but had a different 18th century usage, since it derived from breaching the King's peace and thus embraced the whole range of crimes at common law. Quoting Lord Mansfield, he noted, with respect to the claim of parliamentary privilege, "[t]he laws of this country allow no place or employment as a sanctuary for crime . . . ." *Id.,* at 439.

The subsequent case of *Long* v. *Ansell,* 293 U. S. 76 (1934), held that a Member's immunity from arrest in civil cases did not extend to civil process. Mr. Justice Brandeis wrote for the Court:

> "Clause 1 [of Art. I, § 6] defines the extent of the immunity. Its language is exact and leaves no room for a construction which would extend the privilege beyond the terms of the grant." *Id.,* at 82.

We recognize that the privilege against arrest is not identical with the Speech or Debate privilege, but it is closely related in purpose and origin. It can hardly be thought that the Speech or Debate Clause totally protects what the sentence preceding it has plainly left open to prosecution, *i. e.,* all criminal acts.

(d) MR. JUSTICE WHITE suggests that permitting the Executive to initiate the prosecution of a Member of Con-

gress for the specific crime of bribery is subject to serious potential abuse that might endanger the independence of the legislature—for example, a campaign contribution might be twisted by a ruthless prosecutor into a bribery indictment. But, as we have just noted, the Executive is not alone in possessing power potentially subject to abuse; such possibilities are inherent in a system of government that delegates to each of the three branches separate and independent powers.[16] In The Federalist

[16] The potential for harassment by an unscrupulous member of the Executive Branch may exist, but this country has no tradition of absolute congressional immunity from criminal prosecution. See *United States* v. *Quinn,* 141 F. Supp. 622 (SDNY 1956) (motion for acquittal granted because the defendant Member of Congress was unaware of receipt of fees by his law firm); *Burton* v. *United States,* 202 U. S. 344 (1906) (Senator convicted for accepting compensation to intervene before Post Office Department); *United States* v. *Dietrich,* 126 F. 671 (CC Neb. 1904) (Senator-elect's accepting payment to procure office for another not covered by statute); *May* v. *United States,* 84 U. S. App. D. C. 233, 175 F. 2d 994, cert. denied, 338 U. S. 830 (1949) (Congressman convicted of receiving compensation for services before an agency); *United States* v. *Bramblett,* 348 U. S. 503 (1955) (Congressman convicted of defrauding government agency). *Bramblett* concerned a Congressman's misuse of office funds via a "kick-back" scheme, which is surely "related" to the legislative office.

A strategically timed indictment could indeed cause serious harm to a Congressman. Representative Johnson, for example, was indicted while campaigning for re-election, and arguably his indictment contributed to his defeat. On the other hand, there is the classic case of Mayor Curley who was re-elected while under indictment. See N. Y. Times, Nov. 8, 1945, p. 12, col. 5; 4 New Catholic Encyclopedia 541 (1967). Moreover, we should not overlook the barriers a prosecutor, attempting to bring such a case, must face. First, he must persuade a grand jury to indict, and we are not prepared to assume that grand juries will act against a Member without solid evidence. Thereafter, he must convince a petit jury beyond a reasonable doubt, with the presumption of innocence favoring the accused. A prosecutor who fails to clear one of these hurdles faces serious practical consequences when the defendant is a Congressman. The Legislative Branch is not

No. 73, Hamilton expressed concern over the possible hazards that confronted an Executive dependent on Congress for financial support.

> "The Legislature, with a discretionary power over the salary and emoluments of the Chief Magistrate, could render him as obsequious to their will as they might think proper to make him. They might, in most cases, either reduce him by famine, or tempt him by largesses, to surrender at discretion his judgment to their inclinations."

Yet Hamilton's "parade of horribles" finds little real support in history. The check-and-balance mechanism, buttressed by unfettered debate in an open society with a free press, has not encouraged abuses of power or tolerated them long when they arose. This may be explained in part because the third branch has intervened with neutral authority. See, e. g., *United States* v. *Lovett*, 328 U. S. 303 (1946). The system of divided powers was expressly designed to check the abuses England experienced in the 16th to the 18th centuries.

Probably of more importance is the public reaction engendered by any attempt of one branch to dominate or harass another. Even traditional political attempts to establish dominance have met with little success owing to contrary popular sentiment. Attempts to "purge" uncooperative legislators, for example, have not been notably successful. We are not cited to any cases in which the bribery statutes, which have been applicable to Members of Congress for over 100 years,[17]

without weapons of its own and would no doubt use them if it thought the Executive were unjustly harassing one of its members. Perhaps more important is the omnipresence of the news media whose traditional function and competitive inclination afford no immunities to reckless or irresponsible official misconduct.

[17] The first bribery statute applicable to Congressmen was enacted in 1853. Act of Feb. 26, 1853, c. 81, § 6, 10 Stat. 171.

have been abused by the Executive Branch. When a powerful Executive sought to make the Judicial Branch more responsive to the combined will of the Executive and Legislative Branches, it was the Congress itself that checked the effort to enlarge the Court. 2 M. Pusey, Charles Evans Hughes 749–765 (1951).

We would be closing our eyes to the realities of the American political system if we failed to acknowledge that many non-legislative activities are an established and accepted part of the role of a Member, and are indeed "related" to the legislative process. But if the Executive may prosecute a Member's attempt, as in *Johnson,* to influence another branch of the Government in return for a bribe, its power to harass is not greatly enhanced if it can prosecute for a promise relating to a legislative act in return for a bribe. We therefore see no substantial increase in the power of the Executive and Judicial Branches over the Legislative Branch resulting from our holding today. If we underestimate the potential for harassment, the Congress, of course, is free to exempt its Members from the ambit of federal bribery laws, but it has deliberately allowed the instant statute to remain on the books for over a century.

We do not discount entirely the possibility that an abuse might occur, but this possibility, which we consider remote, must be balanced against the potential danger flowing from either the absence of a bribery statute applicable to Members of Congress or a holding that the statute violates the Constitution. As we noted at the outset, the purpose of the Speech or Debate Clause is to protect the individual legislator, not simply for his own sake, but to preserve the independence and thereby the integrity of the legislative process. But financial abuses by way of bribes, perhaps even more than Executive power, would gravely undermine legislative integrity and defeat the right of the

public to honest representation. Depriving the Executive of the power to investigate and prosecute and the Judiciary of the power to punish bribery of Members of Congress is unlikely to enhance legislative independence. Given the disinclination and limitations of each House to police these matters, it is understandable that both Houses deliberately delegated this function to the courts, as they did with the power to punish persons committing contempts of Congress. 2 U. S. C. § 194.

It is beyond doubt that the Speech or Debate Clause protects against inquiry into acts that occur in the regular course of the legislative process and into the motivation for those acts. So expressed, the privilege is broad enough to insure the historic independence of the Legislative Branch, essential to our separation of powers, but narrow enough to guard against the excesses of those who would corrupt the process by corrupting its Members. We turn next to determine whether the subject of this criminal inquiry is within the scope of the privilege.

## III

An examination of the indictment brought against appellee and the statutes on which it is founded reveals that no inquiry into legislative acts or motivation for legislative acts is necessary for the Government to make out a prima facie case. Four of the five counts charge that appellee "corruptly asked, solicited, sought, accepted, received and agreed to receive" money "in return for being influenced . . . in respect to his action, vote, and decision on postage rate legislation which might at any time be pending before him in his official capacity." This is said to be a violation of 18 U. S. C. § 201 (c), which provides that a Member who "corruptly asks, demands, exacts, solicits, seeks, accepts, receives, or agrees to receive anything of value . . . in

return for . . . (1) being influenced in his performance of any official act" is guilty of an offense.

The question is whether it is necessary to inquire into how appellee spoke, how he debated, how he voted, or anything he did in the chamber or in committee in order to make out a violation of this statute. The illegal conduct is taking or agreeing to take money for a promise to act in a certain way. There is no need for the Government to show that appellee fulfilled the alleged illegal bargain; acceptance of the bribe is the violation of the statute, not performance of the illegal promise.

Taking a bribe is, obviously, no part of the legislative process or function; it is not a legislative act. It is not, by any conceivable interpretation, an act performed as a part of or even incidental to the role of a legislator. It is not an "act resulting from the nature, and in the execution, of the office." Nor is it a "thing said or done by him, as a representative, in the exercise of the functions of that office," 4 Mass., at 27. Nor is inquiry into a legislative act or the motivation for a legislative act necessary to a prosecution under this statute or this indictment. When a bribe is taken, it does not matter whether the promise for which the bribe was given was for the performance of a legislative act as here or, as in *Johnson*, for use of a Congressman's influence with the Executive Branch. And an inquiry into the purpose of a bribe "does not draw in question the legislative acts of the defendant member of Congress or his motives for performing them." 383 U. S., at 185.

Nor does it matter if the Member defaults on his illegal bargain. To make a prima facie case under this indictment, the Government need not show any act of appellee subsequent to the corrupt promise for payment, for it is *taking* the bribe, not performance of the illicit compact, that is a criminal act. If, for example, there were undisputed evidence that a Member took a bribe in exchange

for an agreement to vote for a given bill and if there were also undisputed evidence that he, in fact, voted against the bill, can it be thought that this alters the nature of the bribery or removes it from the area of wrongdoing the Congress sought to make a crime?

Another count of the indictment against appellee alleges that he "asked, demanded, exacted, solicited, sought, accepted, received and agreed to receive" money "for and because of official acts performed by him in respect to his action, vote and decision on postage rate legislation which had been pending before him in his official capacity . . . ." This count is founded on 18 U. S. C. § 201 (g), which provides that a Member of Congress who "asks, demands, exacts, solicits, seeks, accepts, receives, or agrees to receive anything of value for himself for or because of any official act performed or to be performed by him" is guilty of an offense. Although the indictment alleges that the bribe was given for an act that was actually performed, it is, once again, unnecessary to inquire into the act or its motivation. To sustain a conviction it is necessary to show that appellee solicited, received, or agreed to receive, money with knowledge that the donor was paying him compensation for an official act. Inquiry into the legislative performance itself is not necessary; evidence of the Member's knowledge of the alleged briber's illicit reasons for paying the money is sufficient to carry the case to the jury.

MR. JUSTICE WHITE rests heavily on the fact that the indictment charges the offense as being in part linked to Brewster's "action, vote and decision on postage rate legislation." This is true, of course, but our holding in *Johnson* precludes any showing of how he acted, voted, or decided. The dissenting position stands on the fragile proposition that it "would take the Government at its word" with respect to wanting to prove what we all agree

are protected acts that cannot be shown in evidence. Perhaps the Government would make a more appealing case if it could do so, but here, as in that case, evidence of acts protected by the Clause is inadmissible. The Government, as we have noted, need not prove any specific act, speech, debate, or decision to establish a violation of the statute under which appellee was indicted. To accept the arguments of the dissent would be to retreat from the Court's position in *Johnson* that a Member may be convicted if no showing of legislative act is required.

MR. JUSTICE BRENNAN suggests that inquiry into the alleged bribe is inquiry into the motivation for a legislative act, and it is urged that this very inquiry was condemned as impermissible in *Johnson*. That argument misconstrues the concept of motivation for legislative acts. The Speech or Debate Clause does not prohibit inquiry into illegal conduct simply because it has some nexus to legislative functions. In *Johnson,* the Court held that, on remand, Johnson could be retried on the conspiracy-to-defraud count, so long as evidence concerning his speech on the House floor was not admitted. The Court's opinion plainly implies that had the Government chosen to retry Johnson on that count, he could not have obtained immunity from prosecution by asserting that the matter being inquired into was related to the motivation for his House speech. See n. 7, *supra.*

The only reasonable reading of the Clause, consistent with its history and purpose, is that it does not prohibit inquiry into activities that are casually or incidentally related to legislative affairs but not a part of the legislative process itself. Under this indictment and these statutes no such proof is needed.

We hold that under these statutes and this indictment, prosecution of appellee is not prohibited by the Speech

or Debate Clause.[18] Accordingly, the judgment of the District Court is reversed and the case is remanded for further proceedings consistent with this opinion.

*Reversed and remanded.*

MR. JUSTICE BRENNAN, with whom MR. JUSTICE DOUGLAS joins, dissenting.

When this case first came before the Court, I had thought it presented a single, well-defined issue—that is, whether the Congress could authorize by a narrowly drawn statute the prosecution of a Senator or Representative for conduct otherwise immune from prosecution under the Speech or Debate Clause of the Constitution. Counts 1, 3, 5, and 7 of the indictment charged Senator Brewster with receiving $19,000 "in return for being influenced in his performance of official acts in respect to his action, vote, and decision on postage rate legislation which might at any time be pending before him in his official capacity [as a member of the Senate Post Office Committee]." Count 9 charged the Senator with receipt of another $5,000 for acts already performed by him with respect to his "action, vote and decision" on that legislation. These charges, it seemed to me, fell within the clear prohibition of the Speech or Debate Clause as interpreted by decisions of this Court, particularly *United States* v. *Johnson,* 383 U. S. 169 (1966).

[18] In reversing the District Court's ruling that a Member of Congress may not be constitutionally tried for a violation of the federal bribery statutes, we express no views on the question left open in *Johnson* as to the constitutionality of an inquiry that probes into legislative acts or the motivation for legislative acts if Congress specifically authorizes such in a narrowly drawn statute. Should such an inquiry be made and should a conviction be sustained, then we would face the question whether inquiry into legislative acts and motivation is permissible under such a narrowly drawn statute.

For if the indictment did not call into question the "speeches or debates" of the Senator, it certainly laid open to scrutiny the motives for his legislative acts; and those motives, I had supposed, were no more subject to executive and judicial inquiry than the acts themselves, unless, of course, the Congress could delegate such inquiry to the other branches.

That, apparently, was the Government's view of the case as well. At the hearing before the District Court the prosecutor was asked point blank whether "the indictment in any wise allege[d] that Brewster did anything not related to his purely legislative functions." The prosecutor responded:

"We are not contending that what is being charged here, that is, the activity by Brewster, was anything other than a legislative act. We are not ducking the question; it is squarely presented. They are legislative acts. We are not going to quibble over that." App. 28.

The Government, in other words, did not challenge the applicability of the Clause to these charges, but argued only that its prohibitions could be avoided, "waived" as it were, through congressional authorization in the form of a narrowly drawn bribery statute. The District Court accepted the Government's reading of the indictment and held that the Senator could not be prosecuted for this conduct even under the allegedly narrow provisions of 18 U. S. C. § 201:

"Gentlemen, based on the facts of this case, it is admitted by the Government that the five counts of the indictment which charge Senator Brewster relate to the acceptance of bribes in connection with the performance of a legislative function by a Senator of the United States.

> "It is the opinion of this Court that the immunity under the Speech and Debate Clause of the Constitution, particularly in view of the interpretation given that Clause by the Supreme Court in Johnson, shields Senator Brewster, constitutionally shields him from any prosecution for alleged bribery to perform a legislative act." App. 33.

Furthermore, the Government's initial brief in this Court, doubtless reflecting its recognition that *Johnson* had rejected the analysis adopted by the Court today, did not argue that a prosecution for acceptance of a bribe in return for a promise to vote a certain way falls outside the prohibition of the Speech or Debate Clause. Rather, the Government's brief conceded or at least assumed that such conduct does constitute "Speech or Debate," but urged that Congress may enact a statute, such as 18 U. S. C. § 201, providing for judicial trial of the alleged crime.

Given these admissions by the Government and the District Court's construction of the indictment, which settled doctrine makes binding on this Court, *United States* v. *Jones,* 345 U. S. 377, 378 (1953), the only issue properly before us was whether Congress is empowered to delegate to the Executive and Judicial Branches the trial of a member for conduct otherwise protected by the Clause. Today, however, the Court finds it unnecessary to reach that issue, for it finds that the indictment, though charging receipt of a bribe for legislative acts, entails "no inquiry into legislative acts or motivation for legislative acts," *ante,* at 525, and thus is not covered by the Clause. In doing so the Court permits the Government to recede from its firm admissions, it ignores the District Court's binding construction of the

indictment, and—most important—it repudiates principles of legislative freedom developed over the past century in a line of cases culminating in *Johnson*. Those principles, which are vital to the right of the people to be represented by Congressmen of independence and integrity, deserve more than the hasty burial given them by the Court today. I must therefore dissent.

## I

I would dispel at the outset any notion that Senator Brewster's asserted immunity strains the outer limits of the Clause. The Court writes at length in an effort to show that "Speech or Debate" does not cover "all conduct *relating* to the legislative process." *Ante,* at 515. Even assuming the validity of that conclusion, I fail to see its relevance to the instant case. Senator Brewster is not charged with conduct merely *"relating* to the legislative process," but with a crime whose proof calls into question the very motives behind his legislative acts. The indictment, then, lies not at the periphery but at the very center of the protection that this Court has said is provided a Congressman under the Clause.

Decisions of this Court dating as far back as 1881 have consistently refused to limit the concept of "legislative acts" to the "Speech or Debate" specifically mentioned in Art. I, § 6. In *Kilbourn* v. *Thompson,* 103 U. S. 168 (1881), the Court held that:

"It would be a narrow view of the constitutional provision to limit it to words spoken in debate. The reason of the rule is as forcible in its application to written reports presented in that body by its committees, to resolutions offered, which, though in writing, must be reproduced in speech, and to the act of voting, whether it is done vocally or by passing between the tellers. In short, to things generally

done in a session of the House by one of its members in relation to the business before it." *Id.*, at 204. In reaching its conclusion, the Court adopted what was said by the Supreme Judicial Court of Massachusetts in *Coffin* v. *Coffin,* 4 Mass. 1 (1808), which *Kilbourn* held to be perhaps "the most authoritative case in this country on the construction of the provision in regard to freedom of debate in legislative bodies . . . ." 103 U. S., at 204. Chief Justice Parsons, speaking for the Massachusetts court, expressed what *Kilbourn* and later decisions saw as a properly generous view of the legislative privilege:

"These privileges are thus secured, not with the intention of protecting the members against prosecutions for their own benefit, but to support the rights of the people, by enabling their representatives to execute the functions of their office without fear of prosecutions, civil or criminal. I therefore think that the article ought not to be construed strictly, but liberally, that the full design of it may be answered. I will not confine it to delivering an opinion, uttering a speech, or haranguing in debate; but will extend it to the giving of a vote, to the making of a written report, and to every other act resulting from the nature, and in the execution, of the office: and I would define the article, as securing to every member exemption from prosecution, for every thing said or done by him, as a representative, in the exercise of the functions of that office; without enquiring whether the exercise was regular according to the rules of the house, or irregular and against their rules. I do not confine the member to his place in the house; and I am satisfied that there are cases, in which he is entitled to this privilege, when not within the walls of the representatives' chamber." 4 Mass., at 27.

There can be no doubt, therefore, that Senator Brewster's vote on new postal rates constituted legislative activity within the meaning of the Clause. The Senator could not be prosecuted or called to answer for his vote in any judicial or executive proceeding. But the Senator's immunity, I submit, goes beyond the vote itself and precludes all extra-congressional scrutiny as to how and why he cast, or would have cast, his vote a certain way. In *Tenney* v. *Brandhove,* 341 U. S. 367 (1951), the plaintiff charged that a state legislative hearing was being conducted not for a proper legislative purpose but solely as a means of harassing him. Nevertheless the Court held that no action would lie against the committee members under federal civil rights statutes. Mr. Justice Frankfurter stated:

> "The claim of an unworthy purpose does not destroy the privilege. Legislators are immune from deterrents to the uninhibited discharge of their legislative duty, not for their private indulgence but for the public good. One must not expect uncommon courage even in legislators. The privilege would be of little value if they could be subjected to the cost and inconvenience and distractions of a trial upon a conclusion of the pleader, or to the hazard of a judgment against them based upon a jury's speculation as to motives. The holding of this Court in *Fletcher* v. *Peck,* 6 Cranch 87, 130, that it was not consonant with our scheme of government for a court to inquire into the motives of legislators, has remained unquestioned. . . .
>
> ". . . In times of political passion, dishonest or vindictive motives are readily attributed to legislative conduct and as readily believed. Courts are not the place for such controversies. Self-discipline and the voters must be the ultimate reliance for dis-

couraging or correcting such abuses." *Id.*, at 377–378.

Barring congressional power to authorize this prosecution, what has been said thus far would seem sufficient to require affirmance of the order of dismissal, for neither Senator Brewster's vote nor his motives for voting, however dishonorable, may be the subject of a civil or criminal proceeding outside the halls of the Senate. There is nothing complicated about this conclusion. It follows simply and inescapably from prior decisions of this Court, *supra*, setting forth the most basic elements of legislative immunity. Yet the Court declines to apply those principles to this case, for it somehow finds that the Government can prove its case without referring to the Senator's official acts or motives. According to the Court, the Government can limit its proof on Counts 1, 3, 5, and 7 to evidence concerning Senator Brewster's "taking or agreeing to take money for a promise to act in a certain way," and need not show "that appellee fulfilled the alleged illegal bargain; acceptance of the bribe is the violation of the statute, not performance of the illegal promise." *Ante,* at 526. Similarly, the Court finds that Count 9 can be proved merely by showing that the Senator solicited or received money "with knowledge that the donor was paying him compensation for an official act," without any inquiry "into the legislative performance itself." *Ante,* at 527. These evidentiary limitations are deemed sufficient to avoid the prohibitions of the Speech or Debate Clause.

With all respect, I think that the Court has adopted a wholly artificial view of the charges before us. The indictment alleges, not the mere receipt of money, but the receipt of money in exchange for a Senator's vote and promise to vote in a certain way. Insofar as these charges bear on votes already cast, the Government can-

not avoid proving the performance of the bargained-for acts, for it is the acts themselves, together with the motivating bribe, that form the basis of Count 9 of the indictment. Proof of "knowledge that the donor was paying . . . for an official act" may be enough for conviction under § 201 (g). But assuming it is, the Government still must demonstrate that the "official act" referred to was actually performed, for that is what the indictment charges. Count 9, in other words, calls into question both the performance of official acts by the Senator and his reasons for voting as he did. Either inquiry violates the Speech or Debate Clause.

The counts charging only a corrupt promise to vote are equally repugnant to the Clause. The Court may be correct that only receipt of the bribe, and not performance of the bargain, is needed to prove these counts. But proof of an agreement to be "influenced" in the performance of legislative acts is by definition an inquiry into their motives, whether or not the acts themselves or the circumstances surrounding them are questioned at trial. Furthermore, judicial inquiry into an alleged agreement of this kind carries with it the same dangers to legislative independence that are held to bar accountability for official conduct itself. As our Brother WHITE cogently states, *post*, at 556:

> "Bribery is most often carried out by prearrangement; if that part of the transaction may be plucked from its context and made the basis of criminal charges, the Speech or Debate Clause loses its force. It will be small comfort for a Congressman to know that he cannot be prosecuted for his vote, whatever it may be, but he can be prosecuted for an alleged agreement even if he votes contrary to the asserted bargain."

Thus, even if this were an issue of first impression, I would hold that this prosecution, being an extra-congressional inquiry into legislative acts and motives, is barred by the Speech or Debate Clause.

What is especially disturbing about the Court's result, however, is that this is not an issue of first impression, but one that was settled six years ago in *United States* v. *Johnson,* 383 U. S. 169 (1966). There a former Congressman was charged with violating the federal conflict-of-interest statute, 18 U. S. C. § 281 (1964 ed.), and with conspiring to defraud the United States, 18 U. S. C. § 371, by accepting a bribe in exchange for his agreement to seek dismissal of federal indictments pending against officers of several savings and loan companies. Part of the alleged conspiracy was a speech delivered by Johnson on the floor of the House, favorable to loan companies generally. The Government relied on that speech at trial and questioned Johnson extensively about its contents, authorship, and his reasons for delivering it. The Court of Appeals set aside the conspiracy conviction, holding that the Speech or Debate Clause barred such a prosecution based on an allegedly corrupt promise to deliver a congressional speech. In appealing that decision the Government made the very same argument that appears to persuade the Court today:

> "[The rationale of the Clause] is applicable in suits based upon the *content* of a legislator's speech or action, where immunity is necessary to prevent impediments to the free discharge of his public duties. But it does not justify granting him immunity from prosecution for accepting or agreeing to accept money to make a speech in Congress. The latter case poses no threat which could reasonably cause a Congressman to restrain himself in his official speech, because no speech, as such, is being

questioned. It is only the *antecedent conduct* of accepting or agreeing to accept the bribe which is attacked in such a prosecution. 'Whether the party taking the bribe lives up to his corrupt promise or not is immaterial. The agreement is the essence of the offense; when that is consummated, the offense is complete.' 3 Wharton, *Criminal Law and Procedure,* § 1383 (Anderson ed. 1957) . . . . Thus, if respondent, after accepting the bribe, had failed to carry out his bargain, he could still be prosecuted for the same offense charged here, but it could not be argued that any speech was being 'questioned' in his prosecution. The fact that respondent fulfilled his bargain and delivered the corrupt speech should not render the entire course of conduct constitutionally protected." Brief for the United States in *United States* v. *Johnson,* No. 25, O. T. 1965, pp. 10–11.

The *Johnson* opinion answered this argument in two places. After emphasizing that the prosecution at issue was "based upon an allegation that a member of Congress abused his position by conspiring to give a particular speech in return for remuneration from private interests," the Court stated, 383 U. S., at 180:

"However reprehensible such conduct may be, we believe the Speech or Debate Clause extends at least so far as to prevent it from being made the basis of a criminal charge against a member of Congress of conspiracy to defraud the United States by impeding the due discharge of government functions. *The essence of such a charge in this context is that the Congressman's conduct was improperly motivated, and . . . that is precisely what the Speech or Debate Clause generally forecloses from executive and judicial inquiry.*" (Emphasis supplied.)

Again, the Court stated, *id.*, at 182–183:

"The Government argues that the clause was meant to prevent only prosecutions based upon the 'content' of speech, such as libel actions, but not those founded on 'the antecedent unlawful conduct of accepting or agreeing to accept a bribe.' Brief of the United States, at 11. Although historically seditious libel was the most frequent instrument for intimidating legislators, this has never been the sole form of legal proceedings so employed, and the language of the Constitution is framed in the broadest terms."

Finally, any doubt that the *Johnson* Court rejected the argument put forward by the Government was dispelled by its citation of *Ex parte Wason*, L. R. 4 Q. B. 573 (1869). In that case a private citizen moved to require a magistrate to prosecute several members of the House of Lords for conspiring to prevent his petition from being heard on the floor. The court denied the motion, holding that "statements made by members of either House of Parliament in their places in the House . . . could not be made the foundation of civil or criminal proceedings, however injurious they might be to the interest of a third person. And a conspiracy to make such statements would not make the persons guilty of it amenable to the criminal law." *Id.*, at 576 (Cockburn, C. J.). Mr. Justice Blackburn added, "I entirely concur in thinking that the information did only charge an agreement to make statements in the House of Lords, and therefore did not charge any indictable offence." *Ibid.*

*Johnson*, then, can only be read as holding that a corrupt agreement to perform legislative acts, even if provable without reference to the acts themselves, may not be the subject of a general conspiracy prosecution.

In the face of that holding and *Johnson*'s rejection of reasoning identical to its own, the Court finds support in the fact that *Johnson* "authorized a new trial on the conspiracy count, provided that all references to the making of the speech were eliminated." *Ante*, at 511. But the Court ignores the fact that, with the speech and its motives excluded from consideration, this new trial was for nothing more than a conspiracy to intervene before an Executive Department, *i. e.*, the Justice Department. And such executive intervention has never been considered legislative conduct entitled to the protection of the Speech or Debate Clause. See *infra*, at 542. The Court cannot camouflage its departure from the holding of *Johnson* by referring to a collateral ruling having little relevance to the fundamental issues of legislative privilege involved in that case. I would follow *Johnson* and hold that Senator Brewster's alleged promise, like the Congressman's there, is immune from executive or judicial inquiry.

## II

The only issue for me, then, is the one left open in *Johnson*—that is, the validity of a "prosecution which, though possibly entailing inquiry into legislative acts or motivations, is founded [not upon a general conspiracy statute but] upon a narrowly drawn statute passed by Congress in the exercise of its legislative power to regulate the conduct of its members." 383 U. S., at 185. Assuming that 18 U. S. C. § 201 is such a "narrowly drawn statute," I do not believe that it, any more than a general enactment, can serve as the instrument for holding a Congressman accountable for his legislative acts outside the confines of his own chamber. The Government offers several reasons why such a "waiver" of legislative immunity should be allowed. None of these, it seems to me, is sufficient to override

the public's interest in legislative independence, secured to it by the principles of the Speech or Debate Clause.[1]

As a preliminary matter, the Government does not contend, nor can it, that no forum was provided in which Senator Brewster might have been punished if guilty. Article I, § 5, of the Constitution provides that "[e]ach House may determine the Rules of its Proceedings, punish its Members for disorderly Behavior, and, with the Concurrence of two thirds, expel a Member." This power has a broad reach, extending "to all cases where the offence is such as in the judgment of the [House or] Senate is inconsistent with the trust and duty of a member." *In re Chapman,* 166 U. S. 661, 669–670 (1897). *Chapman,* for example, concerned a Senate investigation of charges that Senate members had speculated in stocks of companies interested in a pending tariff bill. Similarly, the House of Representatives in 1873 censured two members for accepting stock to forestall a congressional inquiry into the Credit Mobilier. There are also many instances of imprisonment or expulsion by Parliament of members who accepted bribes.[2]

Though conceding that the Houses of Congress are empowered to punish their members under Art. I, § 5, the Government urges that Congress may also enact a statute, such as 18 U. S. C. § 201, providing for judicial enforcement of that power. In support of this position, the Government relies primarily on the following language from the opinion in *Burton* v. *United States,* 202 U. S. 344, 367 (1906):

"While the framers of the Constitution intended

---

[1] Although the Court does not reach this issue, it adopts many of the Government's arguments to show that the Speech or Debate Clause is or should be wholly inapplicable to this case. My disagreement with these contentions applies equally to their use by the Court in support of its position.

[2] See n. 4, *infra,* and accompanying text.

that each Department should keep within its appointed sphere of public action, it was never contemplated that the authority of the Senate to admit to a seat in its body one who had been duly elected as a Senator, or its power to expel him after being admitted, should, in any degree, limit or restrict the authority of Congress to enact such statutes, not forbidden by the Constitution, as the public interests required for carrying into effect the powers granted to it."

However, *Burton* was not a case that involved conduct protected by the Speech or Debate Clause. Senator Burton was prosecuted for accepting money to influence the Post Office Department in a mail fraud case in violation of Rev. Stat. § 1782, 13 Stat. 123. That was nonlegislative conduct, and as we said in *Johnson, supra,* at 172 "[n]o argument is made, nor do we think that it could be successfully contended, that the Speech or Debate Clause reaches conduct, such as was involved in the attempt to influence the Department of Justice, that is in no wise related to the due functioning of the legislative process." Such a prosecution, as the quoted excerpt from *Burton* specifically said, is "not forbidden by the Constitution," but that holding has little relevance to a case, such as this one, involving legislative acts and motives.

The Government, however, cites additional considerations to support the authority of Congress to provide for judicial trials of corrupt Members; the press of congressional business, the possibility of politically motivated judgments by fellow Members, and the procedural safeguards of a judicial trial are all cited as reasons why Congress should be allowed to transfer the trial of a corrupt Member from the Houses of Congress to the courts. Once again, these are arguments urged and found unpersuasive in *Johnson.* I find them no more

persuasive now. I may assume as a general matter that the "Legislative Branch is not so well suited as politically independent judges and juries to the task of ruling upon the blameworthiness of, and levying appropriate punishment upon, specific persons." *United States* v. *Brown,* 381 U. S. 437, 445 (1965). Yet it does not necessarily follow that prosecutors, judges, and juries are better equipped than legislators to make the kinds of political judgments required here. Senators and Congressmen are never entirely free of political pressures, whether from their own constituents or from special-interest lobbies. Submission to these pressures, in the hope of political and financial support, or the fear of its withdrawal, is not uncommon, nor is it necessarily unethical.[3] The line between legitimate influence and outright bribe may be more a matter of emphasis than objective fact, and in the end may turn on the trier's view of what was proper in the context of the everyday realities and necessities of political office. Whatever the special competence of the judicial process

[3] Cf. Conflict of Interest and Federal Service, Association of the Bar of the City of New York 14–15 (1960):

"The congressman's representative status lies at the heart of the matter. As a representative, he is often supposed to represent a particular economic group, and in many instances his own economic self-interest is closely tied to that group. That is precisely why it selected him. It is common to talk of the Farm Bloc, or the Silver Senators. We would think odd a fishing state congressman who was not mindful of the interests of the fishing industry— though he may be in the fishing business himself, and though his campaign funds come in part from this source. This kind of representation is considered inevitable and, indeed, generally applauded. Sterile application of an abstract rule against acting in situations involving self-interest would prevent the farmer senator from voting on farm legislation or the Negro congressman from speaking on civil rights bills. At some point a purist attitude toward the evils of conflicts of interest in Congress runs afoul of the basic premises of American representative government."

in other areas, members of Congress themselves are likely to be in the better position to judge the issue of bribery relating to legislative acts. The observation of Mr. Justice Frankfurter bears repeating here: "Courts are not the place for such controversies. Self-discipline and the voters must be the ultimate reliance for discouraging or correcting such abuses." *Tenney* v. *Brandhove,* 341 U. S., at 378.

Nor is the Member at the mercy of his colleagues, free to adjust as they wish his rights to due process and free expression. It is doubtful, for example, that the Congress could punish a Member for the mere expression of unpopular views otherwise protected by the First Amendment. See *Bond* v. *Floyd,* 385 U. S. 116 (1966). And judicial review of the legislative inquiry is not completely foreclosed; the power of the House and Senate to discipline the conduct of Members is not exempt from the "restraints imposed by or found in the implications of the Constitution." *Barry* v. *United States ex rel. Cunningham,* 279 U. S. 597, 614 (1929), quoted in *Powell* v. *McCormack,* 395 U. S. 486, 519 n. 40 (1969).

Finally, the Government relies on the history of the Clause to support a congressional power of delegation. While agreeing that the Speech or Debate Clause was a "culmination of a long struggle for parliamentary supremacy" and a reaction against the Crown's use of "criminal and civil law to suppress and intimidate critical legislators," *Johnson, supra,* at 178, the Government urges that this is not the whole story. It points out that while a large part of British history was taken up with Parliament's struggles to free itself from royal domination, the balance of power was not always ranged against it. Once Parliament succeeded in asserting rightful dominion over its members and the conduct of its business, Parliament sought to extend its reach

into areas and for purposes that can only be labeled an abuse of legislative power. Aware of these abuses, the Framers, the Government submits, did not mean Congress to have exclusive power, but one which, by congressional delegation, might be shared with the Executive and Judicial Branches.

That the Parliamentary privilege was indeed abused is historical fact. By the close of the 17th century, Parliament had succeeded in obtaining rights of free speech and debate as well as the power to punish offenses of its members contravening the good order and integrity of its processes. In 1694, five years after incorporation of the Speech or Debate Clause in the English Bill of Rights, Lord Falkland was found guilty in Commons of accepting a bribe of 2,000 pounds from the Crown, and was imprisoned during the pleasure of the House. The Speaker of the House of Commons, Sir John Trevor, was censured for bribery the following year.[4]

But Parliament was not content with mere control over its members' conduct. Independence brought an assertion of absolute power over the definition and reach of institutional privileges. "[T]he House of Commons and the House of Lords claimed absolute and plenary authority over their privileges. This was an independent body of law, described by Coke as *lex parliamenti*. Only Parliament could declare what those privileges were or what new privileges were occasioned, and only Parliament could judge what conduct constituted a breach of privilege." *Watkins* v. *United States*, 354 U. S. 178, 188 (1957). Thus, having established the basic privilege of its members

---

[4] R. Luce, Legislative Assemblies 401–402 (1924). Another notable instance was that of Robert Walpole, who in 1711 was expelled and imprisoned by the House on charges of corruption. T. Taswell-Langmead's English Constitutional History 583–584 (11th ed., T. Plucknett, 1960).

to be free from civil arrest or punishment, the House extended the privilege to its members' servants, and punished trespass on the estates of its members, or theft of their or their servants' goods. The House went so far as to declare its members' servants to be outside the reach of the common-law courts during the time that Parliament was sitting. This led to the sale of "protections" providing that named persons were servants of a particular member and should be free from arrest, imprisonment, and molestation during the term of Parliament.[5] These abuses in turn were brought to America. By 1662, for example, the Virginia House of Burgesses had succeeded in exempting not only its members, but their servants as well, from arrest and molestation.[6]

The Government is correct in pointing out that the Framers, aware of these abuses, were determined to guard against them. Madison stated that the "legislative department is every where extending the sphere of its activity, and drawing all power into its impetuous vortex."[7] And Jefferson looked on the "tyranny of the

---

[5] C. Wittke, The History of English Parliamentary Privilege 39–47 (1921); Taswell-Langmead, *supra*, at 580. The abuse of the privilege lay as much in its arbitrary contraction as extension. In 1763 the House of Commons reacted angrily to a tract written by one of its own members, John Wilkes, and withdrew the privilege from him in order to permit his prosecution for seditious libel. The House also expelled Wilkes, and he fled to France as an outlaw. Upon his return to England in 1768, he was re-elected to Parliament, again expelled, tried for seditious libel, and sentenced to 22 months' imprisonment. The House refused to seat him on three further occasions, and it was not until 1782 that the resolutions expelling Wilkes and declaring him incapable of re-election were expunged from the records of the House. Taswell-Langmead, *supra*, at 584–585; *Powell* v. *McCormack*, 395 U. S. 486, 527–528 (1969).

[6] M. Clarke, Parliamentary Privilege in the American Colonies 99 (1943).

[7] The Federalist No. 48.

legislatures" as "the most formidable dread at present, and will be for long years." [8] Therefore the Framers refused to adopt the *lex parliamenti,* which would have allowed Congressmen and their servants to enjoy numerous immunities from ordinary legal restraints. But it does not follow that the Framers went further and authorized Congress to transfer discipline of bribe takers to the Judicial Branch. The Government refers us to nothing in the Convention debates or in writings of the Framers that even remotely supports the argument. Indeed there is much in the history of the Clause to point the other way, toward a personalized legislative privilege not subject to defeasance even by a specific congressional delegation to the courts.

The *Johnson* opinion details the history. The Clause was formulated by the Convention's Committee on Style, which phrased it by revising Article V of the Articles of Confederation which had provided: "Freedom of speech and debate in Congress shall not be impeached or questioned *in any court,* or place out of Congress." (Emphasis supplied.) This wording derived in turn from the provision of the English Bill of Rights of 1689 that "Freedom of Speech, and Debates or Proceedings in Parliament, ought not to be impeached or questioned *in any Court or Place out of Parliament.*" (Emphasis supplied.) The same wording, or variations of it, appeared in state constitutions. Article VIII of the Maryland Declaration of Rights (1776) declared that legislative freedom "ought not to be impeached in any other court or judicature." The Massachusetts Bill of Rights (Art. XXI, 1780) provided that the "freedom of deliberation, speech, and debate, in either house of the legislature, is so essential to the rights of the people, that it cannot be the foundation of any accusation or prosecution,

---

[8] *Tenney* v. *Brandhove,* 341 U. S. 367, 375 n. 4 (1951).

action or complaint, in any other court or place whatsoever." The New Hampshire Constitution (Art. XXX, 1784) contained a provision virtually identical to Massachusetts'. In short "[f]reedom of speech and action in the legislature was taken as a matter of course by those who severed the Colonies from the Crown and founded our Nation." *Tenney* v. *Brandhove*, 341 U. S., at 372.

Despite his fear of "legislative excess," *Tenney* v. *Brandhove, supra,* at 375, Jefferson, when confronted with criticism of certain Congressmen by the Richmond, Virginia, grand jury, said:

> "[T]hat in order to give to the will of the people the influence it ought to have, and the information which may enable them to exercise it usefully, it was a part of the common law, adopted as the law of this land, that their representatives, in the discharge of their functions, should be free from the cognizance or coercion of the coordinate branches, Judiciary and Executive." 8 The Works of Thomas Jefferson 322 (Ford ed. 1904).

Jefferson's point of view was shared by his contemporaries [9] and found judicial expression as early as 1808, in the *Coffin* opinion, *supra*. It was there stated:

> "In considering this article, it appears to me that the privilege secured by it is not so much the privilege of the house as an organized body, as of each individual member composing it, who is entitled to

---

[9] James Wilson, a member of the Convention committee responsible for the Clause, stated: "In order to enable and encourage a representative of the publick to discharge his publick trust with firmness and success, it is indispensably necessary, that he should enjoy the fullest liberty of speech, and that he should be protected from the resentment of every one, however powerful, to whom the exercise of that liberty may occasion offence." 1 The Works of James Wilson 421 (R. McCloskey ed. 1967).

this privilege, *even against the declared will of the house.* For he does not hold this privilege at the pleasure of the house; but derives it from the will of the people, expressed in the constitution, which is paramount to the will of either or both branches of the legislature. In this respect the privilege here secured resembles other privileges attached to each member by another part of the constitution, by which he is exempted from arrests on *mesne* (or original) process, during his going to, returning from, or attending the general court. Of these privileges, thus secured to each member, he cannot be deprived, by a resolve of the house, or by an act of the legislature." 4 Mass., at 27. (Emphasis supplied.)

In short, if the Framers contemplated judicial inquiry into legislative acts, even on the specific authorization of Congress, that intent is not reflected in the language of the Speech or Debate Clause or contemporary understanding of legislative privilege. History certainly shows that the Framers feared unbridled legislative power. That fact, however, yields no basis for an interpretation that in Art. I, §§ 1 and 8, the Framers authorized Congress to ignore the prohibition against inquiry in "any other place" and enact a statute either of general application or specifically providing for a trial in the courts of a member who takes a bribe for conduct related to legislative acts.[10]

---

[10] While it is true that Congress has made the acceptance of a bribe a crime ever since 1853, it should be noted that the earliest federal bribery statute, passed by Congress in 1790, applied only to judges who took bribes in exchange for an "opinion, judgment or decree." Act of April 30, 1790, 1 Stat. 112, 117. It also appears that the common law did not recognize the charge of bribe-taking by a legislator. Blackstone, for example, defined bribery as "when a judge, or other person concerned in the administration of justice,

### III

I yield nothing to the Court in conviction that this reprehensible and outrageous conduct, if committed by the Senator, should not have gone unpunished. But whether a court or only the Senate might undertake the task is a constitutional issue of portentous significance, which must of course be resolved uninfluenced by the magnitude of the perfidy alleged. It is no answer that Congress assigned the task to the judiciary in enacting 18 U. S. C. § 201. Our duty is to Nation and Constitution, not Congress. We are guilty of a grave disservice to both Nation and Constitution when we permit Congress to shirk its responsibility in favor of the courts. The Framers' judgment was that the American people could have a Congress of independence and integrity only if alleged misbehavior in the performance of legislative functions was accountable solely to a Member's own House and never to the executive or judiciary. The passing years have amply justified the wisdom of that judgment. It is the Court's duty to enforce the letter of the Speech or Debate Clause in that spirit. We did so in deciding *Johnson.* In turning its back on that decision today, the Court arrogates to the judiciary an authority committed by the Constitution, in Senator Brewster's case, exclusively to the Senate of the United States. Yet the Court provides no principled justification, and I can think of none, for its denial that *United States* v. *Johnson* compels affirmance of the District Court. That decision is only six years old and bears the indelible imprint of the distinguished constitutional scholar who wrote the opinion for the Court. *Johnson* surely merited a longer life.

takes any undue reward to influence his behaviour in his office." 4 W. Blackstone, Commentaries *139. Coke also regarded bribery as a crime committed by judges. Coke, Third Institute c. 68, ¶¶ 1–2.

MR. JUSTICE WHITE, with whom MR. JUSTICE DOUGLAS and MR. JUSTICE BRENNAN join, dissenting.

The question presented by this case is not whether bribery or other offensive conduct on the part of Members of Congress must or should go unpunished. No one suggests that the Speech or Debate Clause insulates Senators and Congressmen from accountability for their misdeeds. Indeed, the Clause itself is but one of several constitutional provisions that make clear that Congress has broad powers to try and punish its Members:

> "[T]he Constitution expressly empowers each House to punish its own members for disorderly behavior. We see no reason to doubt that this punishment may in a proper case be imprisonment, and that it may be for refusal to obey some rule on that subject made by the House for the preservation of order.
>
> "So, also, the penalty which each House is authorized to inflict in order to compel the attendance of absent members may be imprisonment, and this may be for a violation of some order or standing rule on that subject.
>
> "Each House is by the Constitution made the judge of the election and qualification of its members. In deciding on these it has an undoubted right to examine witnesses and inspect papers, subject to the usual rights of witnesses in such cases; and it may be that a witness would be subject to like punishment at the hands of the body engaged in trying a contested election, for refusing to testify, that he would if the case were pending before a court of judicature.
>
> "The House of Representatives has the sole right to impeach officers of the government, and the Senate to try them. Where the question of such impeachment is before either body acting in its ap-

propriate sphere on that subject, we see no reason to doubt the right to compel the attendance of witnesses, and their answer to proper questions, in the same manner and by the use of the same means that courts of justice can in like cases." *Kilbourn* v. *Thompson,* 103 U. S. 168, 189–190 (1881).

The sole issue here is in what forum the accounting must take place—whether the prosecution that the Government proposes is consistent with the command that "for any Speech or Debate in either House, they [Members of Congress] shall not be questioned in any other Place." U. S. Const., Art. I, § 6, cl. 1.

The majority disposes of this issue by distinguishing between promise and performance. Even if a Senator or Congressman may not be prosecuted for a corrupt legislative act, the Speech or Debate Clause does not prohibit prosecution for a corrupt promise to perform that act. If a Member of Congress promises to vote for or against a bill in return for money, casts his vote in accordance with the promise and accepts payment, the majority's view is that even though he may not be prosecuted for voting as he did, although the vote was corrupt, the executive may prosecute and the judiciary may try him for the corrupt agreement or for taking the money either under a narrowly drawn statute or one of general application. This distinction between a promise and an act will not withstand scrutiny in terms of the values that the Speech or Debate Clause was designed to secure.

The majority agrees that in order to assure the independence and integrity of the legislature and to reinforce the separation of powers so deliberately established by the Founders, the Speech or Debate Clause prevents a legislative act from being the basis of criminal or civil liability. Concededly, a Member of Congress may not be prosecuted or sued *for* making a speech or voting in

committee or on the floor, whether he was paid to do so or not. The majority also appears to embrace the holding in *United States* v. *Johnson,* 383 U. S. 169 (1966), that a Member of Congress could not be convicted of a conspiracy to defraud the Government where the purposes or motives underlying his conduct as a legislator are called into question. If one follows the mode of the majority's present analysis, the prosecution in *Johnson* was not for speaking, voting, or performing any other legislative act in a particular manner; the criminal act charged was a conspiracy to defraud the United States anterior to any legislative performance. To prove the crime, however, the prosecution introduced evidence that money was paid to make a speech, among other things, and that the speech was made. This, the Court held, violated the Speech or Debate Clause, because it called into question the motives and purposes underlying Congressman Johnson's performance of his legislative duties.

The same infirmity inheres in the present indictment, which was founded upon two separate statutes. Title 18 U. S. C. § 201 (g) requires proof of a defendant's receipt, or an agreement or attempt to receive, anything of value "for or because of any official act performed or to be performed by him . . . ." Of course, not all, or even many, official acts would be legislative acts protected by the Speech or Debate Clause; but whatever the act, the Government must identify it to prove its case. Here we are left in no doubt whatsoever, for the official acts expressly charged in the indictment were in respect to "his action, vote and decision on postage rate legislation." Similarly, there is no basis for arguing that the indictment did not contemplate proof of performance of the act,. for the indictment in so many words charged the arrangement was "for and because of official acts *performed* by him in respect to his action, vote and decision on postage rate legislation which *had been pending* before

him in his official capacity." (Emphasis added.) It is this indictment, not some other charge, that was challenged and dismissed by the District Court. Like that court, I would take the Government at its word: it alleged and intended to prove facts that questioned and impugned the motives and purposes underlying specified legislative acts of the Senator and intended to use these facts as a basis for the conviction of the Senator himself. Thus, taking the charge at face value, the indictment represents an attempt to prosecute and convict a Member of Congress not only for taking money but also *for* performing a legislative act. Moreover, whatever the proof might be, the indictment on its face charged a corrupt undertaking with respect to the performance of legislative conduct that had already occurred and so, without more, "questioned in [some] other Place" the speech and debate of a Member of Congress. Such a charge is precisely the kind that the Senator should not have been called upon to answer if the Speech or Debate Clause is to fulfill its stated purpose.

Insofar as it charged crimes under 18 U. S. C. § 201 (c)(1), the indictment fares little better. That section requires proof of a corrupt arrangement for the receipt of money and also proof that the arrangement was in return for the defendant "being influenced in his performance of any official act . . . ." Whatever the official act may prove to be, the Government cannot prove its case without calling into question the motives of the Member in performing that act, for it must prove that the Member undertook for money to be influenced in that performance. Clearly, if the Government sought to prove its case against a Member of Congress by evidence of a legislative act, conviction could not survive in the face of the holding in *Johnson*. But even if an offense under the statute could be established merely by proof of an undertaking to cast a vote, which is not alleged in the indictment or

shown at trial to have taken place one way or the other, the motives of the legislator in performing his duties with respect to the subject matter of the undertaking would nevertheless inevitably be implicated. In charging the offense under § 201 (c)(1), the indictment alleged a corrupt arrangement made "in return for being influenced in his performance of official acts in respect to his action, vote, and decision on postage legislation which might at any time be pending before him in his official capacity." Again, I would take the Government at its word: it charged and intended to prove facts that could not fail to implicate Senator Brewster's performance of his legislative duties.*

The use of criminal charges "against critical or disfavored legislators by the executive in a judicial forum was the chief fear prompting the long struggle for parliamentary privilege," *United States* v. *Johnson,* 383 U. S., at 182 (1966), and in applying the privilege "we look particularly to the prophylactic purposes of the clause." *Ibid.* Let us suppose that the Executive Branch is informed that private interests are paying a Member of Congress to oppose administration-sponsored legislation. The Congressman is chairman of a key committee where a vote is pending. A representative from the Executive Branch informs the Congressman of the allegations against him, hopes the charges are not true, and expresses confidence that the committee will report the bill and that the Member will support it on the floor. The pressure on the Congressmen, corrupt or not, is undeniable. He

---

*In *Gravel* v. *United States, post,* p. 606, it is held that the Speech or Debate Clause does not immunize criminal acts performed in preparation for or execution of a legislative act. But the unprotected acts referred to there were criminal in themselves, provable without reference to a legislative act and without putting the defendant Member to the task of defending the integrity of his legislative performance. Here, as stated, the crime charged necessarily implicates the Member's legislative duties.

will clearly fare better in any future criminal prosecution if he answers the charge of corruption with evidence that he voted contrary to the alleged bargain. Even more compelling is the likelihood that he will not be prosecuted at all if he follows the administration's suggestion and supports the bill. Putting aside the potential for abuse in ill-conceived, mistaken, or false accusations, the Speech or Debate Clause was designed to prevent just such an exercise of executive power. It is no answer to maintain that the potential for abuse does not inhere in a prosecution for a completed bribery transaction where the legislative act has already occurred. A corrupt vote may not be made the object of a criminal prosecution because otherwise the Executive would be armed with power to control the vote in question, if forewarned, or in any event to control other legislative conduct.

All of this comes to naught if the executive may prosecute for a promise to vote though not for the vote itself. The same hazards to legislative independence inhere in the two prosecutions. Bribery is most often carried out by prearrangement; if that part of the transaction may be plucked from its context and made the basis of criminal charges, the Speech or Debate Clause loses its force. It will be small comfort for a Congressman to know that he cannot be prosecuted for his vote, whatever it may be, but he can be prosecuted for an alleged agreement even if he votes contrary to the asserted bargain.

The realities of the American political system, of which the majority fails to take account, render particularly illusory a Speech or Debate Clause distinction between a promise to perform a legislative act and the act itself. Ours is a representative government. Candidates for office engage in heated contests and the victor is he who receives the greatest number of votes from his constituents. These campaigns are run on

platforms that include statements of intention and undertakings to promote certain policies. These promises are geared, at least in part, to the interests of the Congressman's constituency. Members of Congress may be legally free from dictation by the voters, but there is a residual conviction that they should have due regard for the interests of their States or districts, if only because on election day a Member is answerable for his conduct.

Serving constituents is a crucial part of a legislator's ongoing duties. Congressmen receive a constant stream of complaints and requests for help or service. Judged by the volume and content of a Congressman's mail, the right to petition is neither theoretical nor ignored. It has never been thought unethical for a Member of Congress whose performance on the job may determine the success of his next campaign not only to listen to the petitions of interest groups in his State or district, which may come from every conceivable group of people, but also to support or oppose legislation serving or threatening those interests.

Against this background a second fact of American political life assumes considerable importance for the purposes of this case. Congressional campaigns are most often financed with contributions from those interested in supporting particular Congressmen and their policies. A legislator must maintain a working relationship with his constituents not only to garner votes to maintain his office but to generate financial support for his campaigns. He must also keep in mind the potential effect of his conduct upon those from whom he has received financial support in the past and those whose help he expects or hopes to have in the next campaign. An expectation or hope of future assistance can arise because constituents have indicated that support will be forthcoming if the Member of Congress champions their point of view.

Financial support may also arrive later from those who approve of a Congressman's conduct and have an expectation it will continue. Thus, mutuality of support between legislator and constituent is inevitable. Constituent contributions to a Congressman and his support of constituent interests will repeatedly coincide in time or closely follow one another. It will be the rare Congressman who never accepts campaign contributions from persons or interests whose view he has supported or will support, by speech making, voting, or bargaining with fellow legislators.

All of this, or most of it, may be wholly within the law and consistent with contemporary standards of political ethics. Nevertheless, the opportunities for an Executive, in whose sole discretion the decision to prosecute rests under the statute before us, to claim that legislative conduct has been sold are obvious and undeniable. These opportunities, inherent in the political process as it now exists, create an enormous potential for executive control of legislative behavior by threats or suggestions of criminal prosecution—precisely the evil that the Speech or Debate Clause was designed to prevent.

Neither the majority opinion nor the statute under which Brewster is charged distinguishes between campaign contributions and payments designed for or put to personal use. To arm the Executive with the power to prosecute for taking political contributions in return for an agreement to introduce or support particular legislation or policies is to vest enormous leverage in the Executive and the courts. Members of Congress may find themselves in the dilemma of being forced to conduct themselves contrary to the interests of those who provide financial support or declining that support. They may also feel constrained to listen less often to the entreaties and demands of potential contributors. The threat of prosecution for supposed missteps that

are difficult to define and fall close to the line of what
ordinarily is considered permissible, even necessary, con-
duct scarcely ensures that legislative independence that
is the root of the Speech or Debate Clause.

Even if the statute and this indictment were deemed
limited to payments clearly destined for, or actually put
to, personal use in exchange for a promise to perform a
legislative act, the Speech or Debate Clause would
still be offended. The potential for executive harass-
ment is not diminished merely because the conduct made
criminal is more clearly defined. A Member of Congress
becomes vulnerable to abuse each time he makes a prom-
ise to a constituent on a matter over which he has some
degree of legislative power, and the possibility of harass-
ment can inhibit his exercise of power as well as his
relations with constituents. In addition, such a prose-
cution presents the difficulty of defining when money ob-
tained by a legislator is destined for or has been put to
personal use. For the legislator who uses both personal
funds and campaign contributions to maintain himself
in office, the choice of which to draw upon may have
more to do with bookkeeping than bribery; yet any inter-
change of funds would certainly render his conduct
suspect. Even those Members of Congress who keep
separate accounts for campaign contributions but retain
unrestricted drawing rights would remain open to a
charge that the money was in fact for personal use.
In both cases, the possibility of a bribery prosecution
presents the problem of determining exactly those pur-
poses for which campaign contributions can legitimately
be used. The difficulty of drawing workable lines en-
hances the prospects for executive control and corre-
spondingly diminishes congressional freedom of action.

The majority does not deny the potential for executive
control that inheres in sanctioning this prosecution.
Instead, it purports to define the problem away by assert-

ing that the Speech or Debate Clause reaches only prosecutions for legislative conduct and that a promise to vote for a bill, as distinguished from the vote itself, does not amount to a legislative act. The implication is that a prosecution based upon a corrupt promise no more offends the Speech or Debate Clause than the prosecution of a Congressman for assault, robbery, or murder. The power to prosecute may threaten legislative independence but the Constitution does not for that reason forbid it. I find this unpersuasive.

The fact that the Executive may prosecute Members of Congress for ordinary criminal conduct, which surely he can despite the potential for influencing legislative conduct, cannot itself demonstrate that prosecutions for corrupt promises to perform legislative acts would be equally constitutional. The argument proves too much, for it would as surely authorize prosecutions for the legislative act itself. Moreover, there is a fundamental difference in terms of potential abuse between prosecutions for ordinary crime and those based upon a promise to perform a legislative act. Even the most vocal detractor of Congress could not accurately maintain that the Executive would often have credible basis for accusing a member of Congress of murder, theft, rape, or other such crimes. But the prospects for asserting an arguably valid claim are far wider in scope for an Executive prone to fish in legislative waters and to search for correlations between legislative performance and financial support. The possibilities are indeed endless, as is the potential for abuse.

The majority ignores another vital difference between executive authority to prosecute for ordinary crime and the power to challenge undertakings or conspiracies to corrupt the legislative process. In a prosecution for drunken driving or assault, the manner in which a Congressman performed his legislative tasks is quite irrele-

vant to either prosecution or defense. In the trial of a Congressman for making a corrupt promise to vote, on the other hand, proof that his vote was in fact contrary to the terms of the alleged bargain will make a strong defense. See *United States* v. *Johnson,* 383 U. S., at 176–177. A Congressman who knows he is under investigation for a corrupt undertaking will be well advised to conduct his affairs in a manner wholly at odds with the theory of the charge which may be lodged against him. As a practical matter, to prosecute a Congressman for agreeing to accept money in exchange for a promise to perform a legislative act inherently implicates legislative conduct. And to divine a distinction between promise and performance is wholly at odds with protecting that legislative independence that is the heart of the Speech or Debate Clause.

Congress itself clearly did not make the distinction that the majority finds dispositive. The statute before us is a comprehensive effort to sanitize the legislative environment. It expressly permits prosecutions of members of Congress for voting or promising to vote in exchange for money. The statute does not concern itself with murder or other undertakings unrelated to the legislative process. Congress no doubt believed it consistent with the Speech or Debate Clause to authorize executive prosecutions for corrupt voting. Equally obvious is the fact that Congress drew no distinction in legislative terms between prosecutions based upon voting and those based upon motivations underlying legislative conduct.

The arguments that the majority now embraces were the very contentions that the Government made in *United States* v. *Johnson, supra.* In rejecting those arguments on the facts of that case, where legislative conduct as well as a prior conspiracy formed a major part of the Government's proof, the Court referred with

approval to *Ex parte Wason,* L. R. 4 Q. B. 573 (1869), in which the question was whether members of the House of Lords could be prosecuted for a conspiracy to prevent presentation of a petition on the floor of Lords. *Johnson, supra,* at 183, sets out the reaction of the English court:

> "The court denied the motion, stating that statements made in the House 'could not be made the foundation of civil or criminal proceedings . . . . And a conspiracy to make such statements would not make the person guilty of it amenable to the criminal law.' *Id.,* at 576. (Cockburn, C. J.) Mr. Justice Lush added, 'I am clearly of opinion that we ought not to allow it to be doubted for a moment that the motives or intentions of members of either House cannot be inquired into by criminal proceedings with respect to anything they may do or say in the House.' *Id.,* at 577."

The *Wason* court clearly refused to distinguish between promise and performance; the legislative privilege applied to both. Mr. Justice Harlan, writing for the Court in *Johnson,* took no issue with this position. Indeed, he indicated that the Speech or Debate Clause barred any prosecution under a general statute where there is drawn in question "the legislative acts of . . . the member of Congress *or his motives for performing them.*" 383 U. S., at 185 (emphasis added). I find it difficult to believe that under the statute there involved the *Johnson* Court would have permitted a prosecution based upon a promise to perform a legislative act.

Because it gives a begrudging interpretation to the clause, the majority finds it can avoid dealing with the position upon which the Government placed principal reliance in its brief in this Court. *Johnson* put aside the question whether an otherwise impermissible prosecution

conducted pursuant to a statute such as we now have before us—a statute specifically including congressional conduct and purporting to be an exercise of congressional power to discipline its Members—would be consistent with the Speech or Debate Clause. As must be apparent from what so far has been said, I am convinced that such a statute contravenes the letter and purpose of the Clause. True, Congress itself has defined the crime and specifically delegated to the Executive the discretion to prosecute and to the courts the power to try. Nonetheless, I fail to understand how a majority of Congress can bind an objecting Congressman to a course so clearly at odds with the constitutional command that legislative conduct shall be subject to question in no place other than the Senate or the House of Representatives. The Speech or Debate Clause is an allocation of power. It authorizes Congress to call offending members to account in their appropriate Houses. A statute that represents an abdication of that power is in my view impermissible.

I return to the beginning. The Speech or Debate Clause does not immunize corrupt Congressmen. It reserves the power to discipline in the Houses of Congress. I would insist that those Houses develop their own institutions and procedures for dealing with those in their midst who would prostitute the legislative process.